IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------

John Finn.

    Plaintiff,

vs.

Smith Barney, Citigroup Global Markets Inc.,
Citigroup, Inc.. Brian Williams, and Does 1
through 20, inclusive.

    Defendants.

-----------------------------------------------------

Civil Action Number **JUDGE SWAIN**

**08 CV COMPLAINT 2975**

JURY TRIAL DEMANDED

MAR 21 2008
U.S.D.C. CASHIERS

   Comes now Plaintiff, John Finn. and for a complaint against defendants. Smith Barney.

Citigroup Global Markets Inc.. Citigroup, Inc.. Brian Williams. and Does 1 through 20, inclusive,

states and alleges:

JURISDICTION

1.  This action is brought under Section 10(b) of the Securities Exchange Act of 1934 (15

U.S.C.A. § 78j(b)) and Rule 10b-5 of the Securities and Exchange Commission (17 C.F.R. §

240.10b-5); Section 17(a) of the Securities Act of 1933 (15 U.S.C.A. § 77q(a)): Section 20 of the

Securities Exchange Act of 1934 (15 U.S.C.A. § 78t); and Section 15(c)(1)-(2) of the Securities

Exchange Act of 1934 (15 U.S.C.A. § 78o(c)(1)).

2.  Jurisdiction of the court is based on Section 27 of the Securities Exchange Act of 1934

(15 U.S.C.A. § 78aa) and Sections 1331, 1332 of Title 28 of the United States Code (28

U.S.C.A. §§ 1331, 1332).

3.    The court has pendent jurisdiction over the remaining state law claims that, together with those arising under the laws of the United States, have a common nucleus of operative facts and constitutes a single case or controversy. The amount in controversy, exclusive of interest and costs, exceeds the sum of $400,000.00.

4.    The illegal acts complained of occurred in whole or in substantial part in the Southern District of New York.

PARTIES

5.    Plaintiff John Finn is a citizen and resident of the State of New York.

6.    Defendant Smith Barney is a division of defendant Citigroup Global Markets Inc. which is a corporation organized and existing under the laws of the State of New York; which in turn is a subsidiary of defendant Citigroup. Inc. which is a New York licensed foreign corporation but is organized and existing under the laws of the State of Delaware. Both Citigroup Global Markets Inc. and Citigroup conduct or oversee a general securities brokerage business in the Southern District of the State of New York and elsewhere

7.    Defendant Brian Williams  is a broker employed by the corporate defendants and is a citizen and resident of the State of New York.

2

STATEMENT OF FACTS

8.    Prior to March 2006, plaintiff had a retirement savings account with Smith Barney.

9.    In March 2006, plaintiff sold his home in Williamsburg, New York and realized over $600,000.00, which he wished to preserve as the core of his retirement plan.

10.    At that time, during a telephone conversation between plaintiff and defendant broker Brian Williams, who works for Smith Barney, plaintiff told Williams that he wanted the safest, most liquid investment vehicle in which to place his money.

11.    Williams then recommended securities called action rate preferred bonds which he termed to plaintiff as "municipal bonds" and he told plaintiff that they were completely liquid, safe and were like money market funds. No further explanation regarding the type of securities recommended was given to plaintiff, during or after that conversation.

12.    Thereafter plaintiff deposited approximately $675,000.00 with Smith Barney and defendant Williams chose and purchased numerous of these non-conventional securities.

13.    Unknown to plaintiff was that these securities were far from liquid but were subject to auctions that were created by and run by the very entities that created the securities. If at some point the auctions were to fail, the securities could not be sold and the principal recaptured.

3

14.    If plaintiff had known that there was even the remotest chance that his retirement money could be lost at one fell swoop, he never would have agreed to the recommendation of defendants.

15.    Defendants knew that plaintiff was not educated about what these securities were and had a duty to disclose the nuances of them. In addition, defendants grossly disregarded the suitability of plaintiff for these securities given that he requested the safest and most liquid investments, even though the NASD, since 2003 had warned defendants that such non-standard securities required a heightened inquiry of a customer's suitability and a heightened level of disclosure as to the actual form and working of these investments, including that they could have serious liquidity problems.

16.    Rather, defendants not only represented that these securities were safe and failed to warn of risks, they actively marketed them as money market type investments, including going so far as listing them in such category on monthly statements. Such was in no way true and defendants knew it.

17.    Auction rate securities are long-term, variable rate bonds generally issued through a Dutch auction, with interest rates that reset at short-term intervals—usually 7, 28 or 35 days. Recently, the auctions for these securities have been failing, as investors, concerned about the current credit market environment, have not been willing to participate in the auction. As a result, holders of these securities have not been able to liquidate their positions. This is what has

4

happened to plaintiff and he has been unable to obtain $400,000.00 of his own money and realize the benefit of the use of the same.

18.    Plaintiff has asked his broker and Smith Barney to either liquidate the securities or to loan him the same amount at zero interest until they can be liquidated and to date, defendants have refused.

## FIRST CAUSE OF ACTION

19.    Plaintiff incorporates by way of reference as if more fully set forth here each and every allegation contained in Paragraphs 1 through and including 18 of this complaint.

20.    Finn was, at all times pertinent, unsophisticated in, and lacking knowledge of, business matters and the handling and investing of money and, in particular, was unsophisticated in, and lacked knowledge of, matters relating to investments in the stock market.

21.    Smith Barney is, and was at all times pertinent, a securities brokerage company that, among other things, purchases and sells securities on behalf of its customers. At all times pertinent, defendant securities brokerage was a controlling person of defendant broker, within the meaning of Section 20 of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78t). At all times pertinent, defendant broker was acting within the scope of his employment by defendant securities brokerage within the meaning of Section 4 of Title 7 of the United States Code (7 U.S.C.A. § 2).

22.     After August 2005, and continuing after that time, defendants solicited plaintiff to open an account with defendants for the purpose of purchasing and selling securities through defendants. At the time plaintiff's securities account was opened, defendants knew plaintiff lacked sufficient investment experience and financial acumen to enable plaintiff to make informed decisions about the purchase and sale of securities.

23.     In March , 2006_. Finn spoke to defendant broker by telephone and told him that he had sold his house and that he wanted to invest the proceeds, a sum of approximately $675,116.25, which was to be the basis of his retirement. Finn told defendant broker that he wanted the safest, most liquid investment possible. Defendant broker without hesitation suggested to Finn a type of municipal bond called and auction rate preferred bond. Finn, after hearing the relatively low rate of interest, of near 3 percent, and believing that what defendant broker was recommending was a super safe and conservative investment in municipal bonds. agreed.

24.     Thereafter, with no disclosure to Finn of any of the details regarding the bonds he was purchasing whatsoever. defendant broker purchased securities of *defendant broker's own choosing* totaling approximately $675.116.25. Such securities were not in fact municipal bonds but were non-conventional investments known as "auction rate preferred bonds."

25.     Auction rate securities are long-term. variable rate bonds generally issued through a Dutch auction, with interest rates that reset at short-term intervals—usually 7, 28 or 35 days. Recently, the auctions for these securities have been failing. as investors, concerned about the current credit market environment, have not been willing to participate in the auction. As a

6

result, holders of these securities have not been able to liquidate their positions. This is what has happened to plaintiff and he has been unable obtain the remaining funds tied up in an approximate amount of $400,000.00.

26.    Defendants have long known of the special facts regarding auction rate securities and their heightened duty to inform their customers of the same. In November 2003, the National Association of Security Dealers (NASD), currently known as the Financial Industry Regulatory Authority (FINRA), published a "Notice To Members" warning of special guidelines related to the sale and recommendation of Non-conventional Investments (NCI's), including Auction Rate Preferred Securities. (Attached as Exhibit 1).

27.    FINRA's November 2003 notice warned its members in part:

"[t]he credit risks associated with these myriad forms of collateral are varied and for many noninstitutional parties may be difficult to understand and assess. Other NCIs, . . . may involve greater degrees of risk. These products also tend to have less market liquidity, less transparency as to their pricing and value and may entail significant credit risks that are difficult to understand and assess."

. . .

"NASD is issuing this Notice to Members to remind members of their sales conduct obligations. Given the complex nature of NCIs and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of NCIs. Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products. Accordingly, NASD reminds members that the sale of NCIs, like

more traditional investments. requires them to: (1) conduct appropriate due diligence with respect to these products; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis for recommended transactions; (4) ensure that promotional materials used by the member are fair, accurate, and balanced; (5) implement appropriate internal controls; and (6) provide appropriate training to registered representatives that sell these products. Given the complex and, at times, difficult-to-understand nature of NCIs, members should take particular care to assure that they are fulfilling these obligations."

. . .

"Members must establish sufficient internal controls, including supervision and training requirements. that are reasonably designed to ensure that sales of NCIs comply with all applicable NASD and SEC rules. Members must ensure that their written procedures for supervisory and compliance personnel require that (1) the appropriate due diligence/reasonable-basis suitability is completed before products are offered for sale; (2) associated persons perform appropriate customer-specific suitability analysis; (3) all promotional materials are accurate and balanced; and (4) all NASD and SEC rules are followed. In addition to establishing written procedures, members also must document the steps they have taken to ensure adherence to these procedures."

. . .

"NCIs can be unusual and complex investment vehicles that may appear increasingly attractive to investors during periods in which traditional equity and fixed income investments come into disfavor. However, the unique and complex features of some NCIs may be difficult to understand and may obscure the risks. Accordingly, members must conduct appropriate due diligence/reasonable-basis suitability before offering any product to the public. Likewise. members must

conduct a customer-specific suitability analysis prior to making any recommendations to a customer. Members also must ensure that all promotional materials are fair, accurate, and balanced. Finally, in connection with the recommendation and sale of NCIs, members must ensure that they implement appropriate supervisory internal control and appropriate training to all registered persons who sell such products to customers."

28.    As securities broker/dealers and financial advisors who are members of the NASD/FINRA, defendants were obligated to conduct their business in accordance with various industry rules, regulations, customs and practices.

29.    However, at no time during the relationship between plaintiff and defendants did defendants disclose to plaintiff the actual risk and unsuitability involved in the transactions of the type recommended and/or entered into by defendants on plaintiff's accounts as required and directed by NASD/FINRA rules.

30.    Defendants failed to explain to plaintiff how to properly read and interpret statements sent by defendants to plaintiff concerning plaintiff's accounts. Defendants marketed the auction rate preferred bonds sold to Finn as "money market" funds that implies extreme liquidity. Indeed, the statements appeared to indicate that the purchases were a type of "money market" fund, which are commonly known to be safe and liquid savings funds such as certificates of deposit.

31.    The transactions executed by defendants in plaintiff's securities account were unsuitable

9

for plaintiff in light of the nature of the account, plaintiff's financial situation and stated needs, and plaintiff's investment objectives, in that plaintiff had specifically told defendant broker that he wanted the safest investment possible given that the proceeds from the sale of his home constituted the core of his retirement savings. The above-mentioned transactions were excessive in size given the risk, and were transacted by defendants for defendants' benefit and in disregard of the interests of plaintiff.

32.    Defendants affirmatively misrepresented that the securities it sold Finn were both safe and liquid. Further, defendants never warned Finn that the securities were subject to extreme liquidity risk or ever disclosed that there was no active secondary market for the securities.

33.    The transactions that were mismanaged were the purchase by defendant broker of the following securities:

| | | | |
|---|---|---|---|
| ALLIANCE N.Y. MUNI INC FD | 13 SHARES | $325,029.25 | 03/29/2006 |
| VAN KAMPEN TR INVT GRADE N Y | 5 SHARES | $125,000.00 | 04/13/2006 |
| NUVEEN INSD N Y DIV ADV | 1 SHARE | $25,009.00 | 04/04/2006 |
| NUVEEN N Y SELECT QUALITY MUN | 4 SHARES | $100,033.00 | 04/04/2006 |
| VAN KAMPEN TR INVT GRADE N Y | 4 SHARES | $100,045.00 | 04/04/2006 |

34.    In the last month and weeks, although Finn has directed defendants to liquidate all of the subject securities, or to refund his money, defendants have failed and refused to do so. Such current and non-liquid holdings consist of:

| | | |
|---|---|---|
| ALLIANCE N.Y. MUNI INC FD | 12 SHARES | $300,000.00 |
| NUVEEN N Y SELECT QUALITY MUN | 1 SHARE | $25,000.00 |

VAN KAMPEN TR INVT GRADE N Y    3 SHARES    $75.000.00

35.    The auctions upon which defendants premised the liquidity of the securities have been failing over the last few months and Finn. like perhaps tens of thousands or more other investors. finds his retirement fund completely stranded and essentially gone. (See, press articles. attached as exhibit 2).

36.    Finn never would have allowed defendants to invest any of his money in such securities had they informed him of the true liquidity risks.

37.    The acts and conduct and omissions of defendants were done knowingly by defendants with intent to deceive and defraud plaintiff. In engaging in the acts and conduct, defendants made use of the means and instrumentalities of interstate commerce as a device, scheme, or artifice to defraud, as well as a practiced course of business that operated as a fraud or deceit on plaintiff in violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78j(b)) and Rule 10b-5 of the Securities and Exchange Commission (17 C.F.R. § 240.10b-5); Section 17(a) of the Securities Act of 1933 (15 U.S.C.A. § 77q(a)); and Section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78o(c)(1)).

38.    As a proximate result of the acts and conduct of defendants, plaintiff has been injured and damaged. Plaintiff has suffered the loss of interest and dividend income, and has suffered diminution in the value of plaintiff's investment portfolio.

39.    Plaintiff for months has lost the use of his money and has lost and continues to lose the
value of investment and other opportunities that use of his money would have and could allow
him to realize, all to his great and increasing detriment as every day passes.


40.    The acts, misrepresentations, and omissions of defendants created an unreasonable risk of
emotional disturbance to plaintiff. Defendants knew or should have known that their conduct
would create this risk. As a proximate result of the fraudulent conduct of defendants, plaintiff has
suffered and will continue to suffer mental anguish and emotional distress, causing damages to
plaintiff. Such conduct is of such a nature that defendants should be punished for such conduct.

SECOND CAUSE OF ACTION

41.    Plaintiff incorporates by way of reference as if more fully set forth here each and every
allegation contained in Paragraphs 1 through and including 40 of this complaint.


42.    The Court has jurisdiction of this claim under the doctrine of pendent jurisdiction, in that
the claim in this cause of action arises out of the same transaction as the first cause of action
above.


43.    At the time defendant broker made the representations to plaintiff as alleged in paragraph
11 of the first cause of action, above, he had no reasonable ground for believing them to be true.


44.    The above-mentioned representations were made by defendant broker in a reckless and
negligent manner not warranted by the information that defendants then had concerning the

subject matter of the representations and without regard to whether or not they were true.

45.     As a direct and proximate result of the above-alleged actions of defendants. plaintiff suffered loss and damage as alleged in paragraphs 38. 39 and 40 of the first cause of action above. Such conduct is of such a nature that defendants should be punished for such conduct.

### THIRD CAUSE OF ACTION

46.     Plaintiff incorporates by way of reference as if more fully set forth here each and every allegation contained in Paragraphs 1 through and including 45 of this complaint

47.     The Court has jurisdiction of this claim under the doctrine of pendent jurisdiction, in that the claim in this cause of action arises out of the same transaction as the first cause of action above.

48.     Smith Barney had a duty to supervise defendant broker in connection with the securities transactions the broker recommended and executed for plaintiff.

49.     Smith Barney failed to take affirmative steps to establish the level of sophistication and needs of plaintiff to invest in the various high-risk securities as those purchased and sold by the defendant broker for plaintiffs.

50.     Had the Smith Barney fulfilled its legal duties in this regard, it would have realized that these investments were not suitable for plaintiff and would have prevented the defendant broker

13

from making them.

51.    As a direct and proximate result of such misrepresentations. plaintiff suffered loss and damage as alleged in paragraphs 38. 39 and 40 of the first cause of action above. Such conduct is of such a nature that defendants should be punished for such conduct.

## FOURTH CAUSE OF ACTION

52.    Plaintiff incorporates by way of reference as if more fully set forth here each and every allegation contained in Paragraphs 1 through and including 51 of this complaint

53.    The Court has jurisdiction of this claim under the doctrine of pendent jurisdiction. in that the claim in this cause of action arises out of the same transaction as the first cause of action above.

54.    At the time defendants urged plaintiff to purchase the auction rate securities and at all subsequent times. there existed between plaintiff and defendants a fiduciary relationship by reason of plaintiff's friendly relationship with defendant broker and his reliance upon the advice of defendant broker especially given that he chose not to disclose facts to plaintiff regarding the securities. Such facts included the access of all defendants to books and records and other sources of knowledge concerning the fact that the securities sold to plaintiffs by defendants were not actually bonds, not actually money market accounts, which implied liquidity, and were subject to an auction process which was capable of failing.

14

55.    Pursuant to the above-described relationships, plaintiff reposed complete confidence and trust in defendants to handle his securities account in accordance with plaintiff's stated investment objective. Thus, defendants were obligated to promptly disclose to plaintiff all material facts concerning the risks involved with the securities they sold to plaintiff.

56.    Defendants breached their fiduciary duties to plaintiff in that they failed to disclose to, and continuously concealed from, plaintiff the material facts alleged in the first cause of action.

57.    As a direct and proximate result of such misrepresentations, plaintiff suffered loss and damage as alleged in paragraphs 38, 39 and 40 of the first cause of action above. Such conduct is of such a nature that defendants should be punished for such conduct.

FIFTH CAUSE OF ACTION

58.    Plaintiff incorporates by way of reference as if more fully set forth here each and every allegation contained in Paragraphs 1 through and including 57 of this complaint

59.    The Court has jurisdiction of this claim under the doctrine of pendent jurisdiction, in that the claim in this cause of action arises out of the same transaction as the first cause of action above.

60.    At all times pertinent, plaintiff reposed complete confidence and trust in defendants to handle plaintiff's securities account in accordance with plaintiff's stated investment objective, thus giving rise to a fiduciary duty on the part of defendants to plaintiff.

61.    The above-mentioned acts and conduct of defendants worked a constructive fraud on plaintiff and constituted a breach of fiduciary duty on the part of defendants.

62.    The handling of plaintiff's securities account by defendants was outrageous and showed complete indifference to and conscious disregard for the best interests of plaintiff and was in reckless disregard of plaintiff's rights with full realization of the probable results of such fraudulent handling of plaintiff's account.

63.    As a direct and proximate result of defendants' fraudulent handling of plaintiff's account, plaintiff has suffered damages as more fully set forth in paragraphs 38, 39 and 40 of the first cause of action above, and has suffered and will continue to suffer mental anguish and emotional distress. Such conduct is of such a nature that defendants should be punished for such conduct.

SIXTH CAUSE OF ACTION

64.    Plaintiff incorporates by way of reference as if more fully set forth here each and every allegation contained in Paragraphs 1 through and including 63 of this complaint

65.    The Court has jurisdiction of this claim under the doctrine of pendent jurisdiction, in that the claim in this cause of action arises out of the same transaction as the first cause of action above.

66.    Defendants violated section IM-2310 of the Conduct Rules of the NASD by failing to

16

determine and have reasonable grounds for believing that defendant broker's recommendation of the purchased securities were suitable to plaintiff; therefore defendants did not comply with the rules of the NASD.

67.    Defendants violated section IM-2310-2(e) of the Conduct Rules of FINRA by failing make every effort to familiarize themselves with each customer's financial situation, trading experience, and ability to meet the risks involved with such products and to make every effort to make customers aware of the pertinent information regarding the products; therefore defendants did not comply with the rules of FINRA.

68.    Defendants violated section IM-2310-2(e) of the Conduct Rules of FINRA by failing make every effort to familiarize themselves with each customer's financial situation, trading experience, and ability to meet the risks involved with such products and to make every effort to make customers aware of the pertinent information regarding the products; therefore defendants did not comply with the rules of FINRA.

69.    Defendants wholly failed to implement or adhere to the rules of FINRA as amplified by the warning contained in the November 2003 Notice To Members detailing the risks and specials needs of brokers to carefully assess the suitability of non-conventional investments such as auction rate preferred securities and provide special disclosure to clients such as plaintiff.

70.    Smith Barney, with total disregard for the needs of plaintiff, and with full knowledge both that there existed a relationship of confidence between it and plaintiff and of the position of

superior knowledge that defendant broker had in relation to plaintiff with regard to the true facts, made representations to plaintiff with reckless disregard for the truth or falsity of the statements, fully knowing that plaintiff would rely on them. Such conduct is of such a nature that defendants should be punished for such conduct.

71.    As a direct and proximate result of defendants' reckless disregard and fraud, plaintiff has suffered damages as more fully set forth in paragraphs 38, 39 and 40 of the first cause of action above, and has suffered and will continue to suffer mental anguish and emotional distress. Such conduct is of such a nature that defendants should be punished for such conduct.

WHEREFORE, plaintiff requests:

1.    Judgment against defendants in the amount of $1,000,000.00 as actual damages, together with legal interest;

2.    Judgment against defendants in the amount of $3,000,000.00 as punitive damages;

3.    Costs and expenses of this action;

4.    Reasonable attorney fees; and

5.    Such other and further relief as the court deems just and proper.

Dated:   March 20, 2008

Ravi Ivan Sharma (RS2064)
Attorney for plaintiff
404 Park Avenue South, 14th Floor
New York, NY 10016
(212) 686-3434 x212

## VERIFICATION

John Finn, duly sworn, hereby verifies under penalties of perjury under the laws of the

State of New York the following:

That he has read the foregoing Verified Complaint and that the same is true to his own

knowledge except as to the matters which are stated therein to be alleged on information and

belief, and to those matters, he believes them to be true.

Date: New York, New York


_____

John Finn




Notary:


STATE OF NEW YORK, COUNTY OF NEW YOR . ss.

On the 20th day of March 2007. before me, the undersigned notary public. personally appeared John Finn, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument. the individual. or the person upon behalf of which the individual acted. executed the instrument.


_____
Notary Public
My commission expires on

**DION H. FOTOPOULOS**
Notary Public, State of New York
No. 01FO6039812
Qualified in Bronx County
Commission Expires April 3, 20_ _

17

# EXHIBIT 1

# Notice to Members

Legal/Compliance
Retail
Senior Management
Internal Audit

Advertising and Sales Literature
Due Diligence
Non-Conventional Investments
Suitability

INFORMATIONAL

## Non-Conventional Investments

NASD Reminds Members of Obligations When
Selling Non-Conventional Investments

### Executive Summary

In the aftermath of the recent downturn in the equity markets,
NASD reviewed the services and products offered by members and
observed that retail investors were being offered an array of
different investments as alternatives to conventional equity and
fixed-income investments. These alternative investments do not fall
under a common category; the staff review indicates that brokers
and retail investors have shown increased interest in products such
as asset-backed securities, distressed debt, and derivative products
(for ease of reference these products are collectively refered to as
non-conventional investments or "NCIs"). NCIs often have complex
terms and features that are not easily understood. NASD staff
reminds members that the fact that an investment is an NCI does
not in any way diminish a member's responsibility to ensure that
such a product is offered and sold in a manner consistent with the
member's general sales conduct obligations. This *Notice to Members*
reminds members offering NCIs of their obligations to: (1) conduct
adequate due diligence to understand the features of the product;
(2) perform a reasonable-basis suitability analysis; (3) perform
customer-specific suitability analysis in connection with any
recommended transactions; (4) provide a balanced disclosure of both
the risks and rewards associated with the particular product,
especially when selling to retail investors; (5) implement appropriate
internal controls; and (6) train registered persons regarding the
features, risks, and suitability of these products.

# 03-71

## Questions/Further Information

Questions regarding this *Notice* may be directed to Gary L. Goldsholle, Associate General Counsel, Regulatory Policy and Oversight, NASD, at (202) 728-8104; or Janene Marasciullo, Senior Attorney, Regulatory Policy and Oversight, NASD, at (202) 974-2978.

## Background and Discussion

As a result of the recent downturn in the equity markets and historically low interest rates, brokers and retail investors have been turning to alternative investment vehicles in search of a better return or yield on investments. A review of members indicated that there is an increased interest in a variety of NCIs that have a wide array of terms, conditions, risks, and rewards.[1] Some of these NCIs are marketed as offering greater security or a "guaranteed" return on investments. Other products seek to maximize the potential return on investments. Some of these products have unique features relating to risk and reward that may not be readily understood, especially by retail investors.

For example, certain asset-backed securities and corporate bonds are secured by a range of collateral such as mobile homes, future royalty payments on popular music, payments from consumer credit cards or other consumer goods. The credit risks associated with these myriad forms of collateral are varied and for many non-institutional parties may be difficult to understand and assess. Other NCIs, such as distressed corporate bonds and certain derivative contracts, may be offered to retail investors in an attempt to maximize the return on investment, but they correspondingly may involve greater degrees of risk. These products also tend to have less market liquidity, less transparency as to their pricing and value and may entail significant credit risks that are difficult to understand and assess.

In sum, recent trends indicate that brokers and investors may be turning to NCIs in search of increased yield or return. Although these products may have attractive qualities, it is crucial that members understand the distinct features, and risks and rewards, of any product they sell. Thus, whenever members recommend NCIs to investors, they must take special care to ensure that all registered persons understand the features of the product in order to be in a position to perform the required suitability analysis before executing a transaction. Likewise, members have an obligation to ensure that all marketing materials used by the member provide an accurate and balanced description of the risks and rewards.

NASD is issuing this *Notice to Members* to remind members of their sales conduct obligations.[2] Given the complex nature of NCIs and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of NCIs. Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products. Accordingly, NASD reminds members that the sale of NCIs, like more traditional investments, requires them to:



(1) conduct appropriate due diligence with respect to these products; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis for recommended transactions; (4) ensure that promotional materials used by the member are fair, accurate, and balanced; (5) implement appropriate internal controls; and (6) provide appropriate training to registered representatives that sell these products. Given the complex and, at times, difficult-to-understand nature of NCIs, members should take particular care to assure that they are fulfilling these obligations.

## Due Diligence/ Reasonable-Basis Suitability

As NASD noted most recently in *Notice to Members 03-07* (pertaining to hedge fund sales to customers), performing appropriate due diligence is crucial to a member's obligation to undertake the required reasonable-basis suitability analysis.[3] A reasonable-basis suitability determination is necessary to ensure that an investment is suitable for some investors (as opposed to a customer-specific suitability determination, discussed below, which is undertaken on a customer-by-customer basis). Thus, the reasonable-basis suitability analysis can only be undertaken when a member understands the investment products it sells. Accordingly, a member must perform appropriate due diligence to ensure that it understands the nature of the product, as well as the potential risks and rewards associated with the product. Moreover, the fact that a member intends to offer an NCI only to institutional investors does not relieve the member of its responsibility to conduct due diligence and a reasonable-basis suitability analysis.

The type of due diligence investigation that is appropriate will vary from product to product. However, there are some common features that members must understand about products before registered representatives can perform the appropriate suitability analysis. These features include, but are not limited to:

> The liquidity of the product
>
> The existence of a secondary market and the prospective transparency of pricing in any secondary market transactions
>
> The creditworthiness of the issuer
>
> The creditworthiness and value of any underlying collateral
>
> Where applicable, the creditworthiness of the counterparties
>
> Principal, return, and/or interest rate risks and the factors that determine those risks
>
> The tax consequences of the product
>
> The costs and fees associated with purchasing and selling the product

Members should examine these and other appropriate factors when conducting due diligence. A member may in good faith rely on representations concerning an NCI contained in a prospectus or disclosure document. However, reliance on such materials alone may not be sufficient for a member to satisfy its due diligence requirements where the content of the prospectus or disclosure document does not provide the member with sufficient information to fully evaluate the risk of the product or to educate and train its registered persons for sales purposes. In such case, the member must seek additional information about the NCI or conclude that the product is not appropriate for sale to the public. In addition, members should ensure that the persons responsible for conducting due diligence have appropriate training and skill to evaluate the terms of the investment as well as the potential risks and benefits.

## Customer-Specific Suitability

Members and their associated persons must reasonably believe that the product is a suitable investment prior to making a recommendation to a particular customer. To ensure that a particular investment is suitable for a specific customer, members and their registered persons must examine: (1) the customer's financial status; (2) the customer's tax status; (3) the customer's investment objectives; and (4) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer. [3]

NASD cautions members against relying too heavily upon a customer's financial status as the basis for recommending NCIs. A customer's net worth alone is not necessarily determinative of whether a particular product is suitable for that investor. Given the unique nature of NCIs, these products may present challenges when it comes to a member's duty to dispense its suitability obligation; however, the difficulty in meeting such challenges cannot be considered as a mitigating factor in determining whether members have met their suitability obligations. NCIs with particular risks may be suitable for recommendation to only a very narrow band of investors capable of evaluating and being financially able to bear those risks.

## Promotional Materials

Sales materials and oral presentations regarding NCIs must present a fair and balanced picture regarding both the risks and benefits of investing in these products. For example, members may not claim that certain NCI products, such as asset-backed securities, distressed debt, derivative contracts, or other products, offer protection against declining markets or protection of invested capital unless these statements are fair and accurate. Moreover, when promoting the advantages of NCIs, it is critical that members balance their promotional materials with disclosures of the corresponding risks and limitations of the product discussed above in the "Due Diligence/Reasonable Basis Suitability" section of this *Notice*.



Additionally, if applicable, members should provide investors with any prospectus and other disclosure material provided by the issuer or the sponsor. NASD reminds members, however, that simply providing a prospectus or offering memoranda does not cure unfair or unbalanced sales or promotional materials, whether prepared by the member, sponsor, or issuer.[5]

## Internal Controls

Members must establish sufficient internal controls, including supervision and training requirements, that are reasonably designed to ensure that sales of NCIs comply with all applicable NASD and SEC rules. Members must ensure that their written procedures for supervisory and compliance personnel require that (1) the appropriate due diligence/reasonable-basis suitability is completed before products are offered for sale; (2) associated persons perform appropriate customer-specific suitability analysis; (3) all promotional materials are accurate and balanced; and (4) all NASD and SEC rules are followed. In addition to establishing written procedures, members also must document the steps they have taken to ensure adherence to these procedures.

## Training

Members must train registered persons about the characteristics, risks, and rewards of each product before they allow registered persons to sell that product to investors. Likewise, members should train registered persons about the factors that would make such products either suitable or unsuitable for certain investors. Members' focus on training should not be limited to representatives selling such products; members also should provide appropriate training to supervisors of registered persons selling NCIs.

For a variety of reasons, the need for adequate training is heightened when registered persons sell NCIs. First, due to the unique nature of these products, many investors, especially retail investors, may not understand the features of the product, and may not fully appreciate the associated risks of investing in them. Moreover, in light of the fact that investors may be turning to these products as an alternative to traditional equity and fixed income investments, it is crucial for registered persons to provide a full and balanced disclosure regarding both the risks and the rewards of these products.

Educational brochures, videos, lectures, explanatory memoranda, and Web-based seminars are all appropriate ways of delivering training. The particular training methods will vary based upon the products themselves, as well as the size and customer base of the firm. NASD encourages firms that offer NCIs to offer training about these products as part of the Firm Element of their Continuing Education Program.

## Conclusion

NCIs can be unusual and complex investment vehicles that may appear increasingly attractive to investors during periods in which traditional equity and fixed income investments come into disfavor. However, the unique and complex features of some NCIs may be difficult to understand and may obscure the risks. Accordingly, members must conduct appropriate due diligence/reasonable-basis suitability before offering any product to the public. Likewise, members must conduct a customer-specific suitability analysis prior to making any recommendations to a customer. Members also must ensure that all promotional materials are fair, accurate, and balanced. Finally, in connection with the recommendation and sale of NCIs, members must ensure that they implement appropriate supervisory internal control and appropriate training to all registered persons who sell such products to customers.

## Endnotes

1   Approximately 35% of the firms reviewed sold NCIs in denominations that raise the possibility of sales to retail investors. The list of NCIs being offered is broad and includes asset-backed securities, index-linked notes, non-traded REITS, equity-linked notes, multi-callable step up notes, redeemable secured notes, auction rate preferred securities, principal protected index-linked CDs, distressed debt, derivative products, and emerging market debt securities.

2   Members also are reminded of the application of IM-2310-2(e) (Fair Dealing with Customers with Regard to Derivative Products or New Financial Products), which emphasizes members' obligations for fair dealing with customers when making recommendations or accepting orders for new financial products.

3   NASD's use of the term "due diligence" is not intended to equate the responsibilities of a member for its sales conduct obligations with the requirements of an underwriter under Section 11 of the Securities Act of 1933 and Securities Act Rule 176.

4   NASD Conduct Rule 2310(b).

5   See NASD Letter of Acceptance, Waiver and Consent, Altegris Invs., Inc., and Robert Amedeo, No. CAF030015 (April 15, 2003).

©2003. NASD. All rights reserved. Notice to Members attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

# EXHIBIT 2

The New York Times

March 9, 2008

FAIR GAME

# As Good as Cash, Until It's Not

### By GRETCHEN MORGENSON

INVESTORS across the nation are finding themselves in Wall Street's version of the Hotel California: they have checked into an investment they can never leave.

The investments, which Wall Street peddled as a cash equivalent, are known as auction-rate notes. They're debt instruments carrying rates that reset regularly, usually every week, after auctions overseen by the brokerage firms that originally sold them. They have long-term maturities or, in fact, no maturity dates at all.

But because the notes routinely traded hands at auctions, Wall Street convinced investors that they were just as good as cold, hard cash.

Lo and behold, the $330 billion market for auction-rate notes ground to a halt in mid-February when bids for the securities disappeared. Investors who thought they could sell their holdings easily are now stuck with them. It turns out that the only thing that's really just as good as cash is, well, cash.

While investors pray for a resurrection in the auction market, they are receiving a fixed interest rate outlined in offering documents. Historically, these securities have paid approximately one percentage point more than money market funds. Many purchasers of these notes are relatively small individual investors; several years ago, banks dropped the minimum investment in them to $25,000 from $250,000.

Municipalities and other tax-exempt institutions have issued most of the current crop of auction-rate notes. But closed-end mutual funds issued $65 billion worth. Such borrowings provide leverage to the funds, letting them generate slightly higher yields for their common stockholders.

Closed-end funds that issue auction-rate notes typically sell them in amounts worth one-third the value of their underlying assets. For example, the John Hancock Tax-Advantaged Dividend Income fund, with $1.17 billion in assets, has issued $380 million in auction-rate notes.

Owners of notes issued by closed-end funds are faring far worse than investors stuck with municipal issues. That's because the interest rates paid on municipal notes when auctions fail are capped at as much as 12 percent, much higher than the caps on

closed-end fund notes, which are currently around 3.25 percent.

In other words, holders of closed-end fund notes receive little to no premium for being stranded. Even airlines try to give you a free meal or an upgrade when they leave you at the gate. Investors are likely to remain in this vise because closed-end fund issuers have no incentive to redeem their notes since the interest rates resulting from the failed auctions are so low.

Some customers who have tried to get their brokers to cash them out say the firms have responded by offering to let them borrow against the value of these securities. At a cost, of course: the typical margin rate for borrowers is at least 7 percent at most shops. Other holders are selling the notes at a deep discount to speculators willing to buy distressed securities.

Wall Street made generous fees issuing these securities and running the auctions — as long as there were bidders. After the bidders vanished, some firms stepped in and bid for the securities for a while, giving investors a way out.

No more. What's the sense stretching your already-thin balance sheet just to keep a market open for your customers?

In interviews, investors who own these securities say they weren't warned that they might not be able to sell them if an auction failed. They say they were told that the instruments were as safe and liquid as — yes, you guessed it — cash.

Stephen N. Joffe, a client of UBS Financial Services, is suing the firm because it put all $1.35 million of his charitable foundation's cash into auction-rate securities issued by Eaton Vance Limited Duration funds. This, even though he said he explicitly told the broker to take no risk and that he would need constant access to the funds.

Dr. Joffe, 65, is a former professor of surgery who founded LCA-Vision Inc., a company that operates laser vision-correction centers. "I never asked my broker to get me a better rate," he said. "I felt the responsibility to maintain this account as a risk-free account. I believed this was in the equivalent of an overnight money market account."

Now, the Joffe Foundation can no longer fund programs that help prevent AIDS in Africa, provide indigent people with laser vision correction and correct the cleft palates of African children.

"This was another hit and run by Wall Street," said Jacob H. Zamansky, a lawyer in New York who represents Mr. Joffe. "The banks reaped huge fees on the auctions and underwriting, then left investors holding the bag."

UBS declined to comment.

IN recent days, executives at several closed-end funds have held conference calls with stricken investors. But the investors say that none of those funds have offered to redeem their auction-rate notes. That's not surprising: their fee structures give them no incentive to buy out investors.

Unlike no-load mutual funds, closed-end funds are sold, not bought. They often decline to prices that are a discount from their net asset values after they are first offered for sale. One reason for the discount is that it reflects the brokers' commissions.

But Arthur D. Lipson, an investor in distressed securities and a principal at Western Investment LLC, argues that these discounts present an opportunity for closed-end funds to do the right thing, for both common and preferred shareholders.

Here is Mr. Lipson's solution: Because these funds trade at discounts, he suggests that their managers sell underlying securities — utility stocks and shares of real estate investment trusts — and use the proceeds to buy back common shares. This would shrink the size of the funds and allow them to redeem some of the preferred shares they issued to increase the fund's yield.

Managers hate this idea, Mr. Lipson said, because it would severely reduce the management fees they receive, based on the assets in the funds. So he has mounted proxy fights at three funds, seeking board representation to try to force them to follow his prescription.

The three funds are John Hancock Tax-Advantaged Dividend Income, which trades at around 7.5 percent less than its net asset value; the Cohen & Steers REIT and Utility Income fund, trading at a 10.5 percent discount; and Cohen & Steers Select Utility, which carries a 5 percent discount.

"The directors of these funds have ignored their responsibilities to the shareholders and have chosen to protect the managers' fee income," Mr. Lipson said. "These are not operating companies where moms and pops would be out of work. They are merely financial engineering companies."

Officials at the funds contend that Mr. Lipson is a speculator out for a fast buck. They urge shareholders to vote against him, saying that they have taken steps to improve fund performance.

As for the frozen market for auction-rate notes, both fund companies say they are working with regulators on a solution.

The annual meeting for shareholders in the John Hancock fund is scheduled for March 31; shareholders in the two Cohen & Steers funds will vote on Mr. Lipson's dissident slate the next day.

That is about the time that investors will receive their first brokerage statements reflecting major declines in the value of auction-rate notes. It certainly would be a happy ending to this mess if closed-end funds were forced to redeem the notes by selling holdings as Mr. Lipson suggests.

Stay tuned.

Copyright 2008 The New York Times Company



# The Troubles of Auction Rate Preferred Shares

By James B. Stewart
February 26, 2008

**THEY WERE SOLD** as a liquid, safe, slightly higher-yielding, tax-exempt alternative to money-market funds. I should know, since I bought some.

For several years I've been parking a good part of my cash in Auction Rate Preferred Shares (ARPS). These are typically shares of a closed-end fund that used the proceeds to buy triple-A-rated securities. (In my case, municipal bonds.) There was virtually no interest rate risk since the rate was set at frequent auctions of the shares. My shares were issued by

BlackRock (BLK[1]), the asset-management firm almost half-owned by Merrill Lynch (MER[2]); many other firms also sold the securities. When I needed cash, I simply redeemed shares, as I did last month when I took advantage of the market downturn to buy stocks.

Last week, when I read that some tax-exempt entities, even the Metropolitan Museum of Art, were suddenly paying exorbitant rates because of "failed" auctions for municipal bonds, I didn't immediately suspect this would have any immediate impact on me. I heard nothing from Merrill Lynch, which sold me the ARPS. My account statement continues to show the shares at full face value.

I became more concerned as news reports of "failed" auctions continued last week. Finally, I called a broker to ask about the status of my ARPS. I learned that recent auctions of these preferred shares have indeed failed, which means there were no buyers at rates acceptable to the sellers. The market has virtually collapsed. There is no guarantee the shares can be sold. Indeed, it's highly unlikely they can be. What was a ready source of cash is now essentially frozen.

Last year, when some money-market funds turned out to hold some mortgage-backed securities and faced a liquidity crisis, their sponsors stepped in and redeemed the shares at face value. This seemed the only decent course, not to mention a good long-term investment in customer loyalty.

But when I asked a broker at Merrill Lynch if it would do the same for owners of these money-market equivalents, the answer was "no" — not after the multibillion-dollar write-offs Merrill has already taken on illiquid assets. Merrill Lynch and the other big banks which sold these shares have stopped making a market in them, which is a major reason the auctions have failed.

Merrill Lynch, when asked for comment, told me: "We are offering our clients loans which can give them liquidity." It wasn't yet clear whether these would be interest-free loans, which they certainly should be, in my opinion.

BlackRock commented on its web site that, "We do not see any issues with the financial health or fundamentals of these funds as a result of the failed auctions." The firm also stated online that it "continues to closely monitor developments in the ARPS market."

The amount of auction rate preferred shares outstanding is massive — an estimated $330 billion. Many firms besides Merrill Lynch sold the shares. I suspect that many investors own these and still don't realize the predicament they're in. Fortunately, I have no immediate need for the cash. But given that these securities were marketed as money-market alternatives, I'm sure that there are plenty of people who do, and will be in for a rude shock when they try to redeem them.

I hope that this will be a temporary paralysis and the market will come to its senses. The auctions have been going on for 20 years without incident. These securities still carry a triple-A rating. None of the underlying bonds have defaulted. Interest is still being paid, at a slightly higher rate than before.

In my view, any failure of the big banks to honor what is at least a moral commitment to the people to whom they sold these shares, as well as any failure to notify them, keep them informed, and work out solutions for people facing hardship, is appalling. At least two states are investigating and I would expect them to be joined by the Securities and Exchange Commission.

So the credit crisis has struck again, this time in what I thought was the safest corner of my portfolio. Is any fixed-income security short of U.S. Treasurys and the biggest, most liquid money-market funds safe at this point? I'd like to think so, but this experience has left me shaken. I don't want to contribute to the irrational panic that seems to have swept the debt markets. But if you own any securities that depend on investor confidence or raise any liquidity issues, be aware of the risks.

Links in this article:
[1] http://www.smartmoney.com/cfscripts/Director.cfm?searchString=BLK
[2] http://www.smartmoney.com/cfscripts/Director.cfm?searchString=MER

Case 1:08-cv-02975-LTS    Document 1    Filed 03/21/2008    Page 33 of 41

URL for this article:
http://www.smartmoney.com:80/commonsense/?story=20080226-auction-rate-preferred-shares

Customer Service | Magazine Customer Service | Subscribe to SmartMoney Magazine | Your Profile | Contact Us
Corrections | Custom Publishing | License Our Content | Media Kit | Press Room | Events | Site Map | RSS

smSmallBiz ™ SMARTMONEY ® Layout and look and feel of SmartMoney.com and smSmallBiz.com are trademarks of SmartMoney, a joint venture between
Dow Jones & Company, Inc. and Hearst SM Partnership. © 1995 - 2008 SmartMoney. All Rights Reserved. By accessing and using this page, you agree to our
terms and conditions and our PRIVACY STATEMENT. All quotes delayed by 20 minutes. Delayed quotes provided by Interactive Data Real-Time Services, Inc.
Historical prices and fundamental data provided by Hemscott, Inc. Mutual fund data provided by Lipper. Mutual Fund NAVs are as of previous day's close.
Earnings estimates provided by Zacks Investment Research. Insider trading data provided by Thomson Financial. Upgrades and downgrades provided by
Briefing.com.
You Are Viewing: The Troubles of Auction Rate Preferred Shares (Merrill Lynch, Blackrock).

3/20/08 2:06 AM

Case 1:08-cv-02975-LTS          Document 1          Filed 03/21/2008          Page 34 of 41

INTERNATIONAL

# Herald Tribune

## Auctions yield chaos for bonds

**By Floyd Norris**
Wednesday, February 20, 2008

As municipal bond auctions continue to fail  and to produce very odd interest rates when they succeed  it is becoming clear that the auction-rate market is in crisis and chaos, and many securities may never have a successful auction again.

If they continue, the auction failures could lead to the selling of billions of dollars in municipal bonds. That, in turn, could push up the rates that cities and states must pay to borrow money.

The failures also indicate that talk of rescuing municipal bond insurance companies, like Ambac and MBIA, has not reassured investors. Auctions continue to fail, even at absurdly high yields, if the principal guarantee of repayment is an insurance policy.

As evidence of the chaos in the market, among auctions Tuesday were two virtually identical securities (differing only in the original underwriter) that produced wildly different rates: one 7.98 percent, the other 5 percent.

The auction-rate market was invented in 1984 by an investment banker at Lehman Brothers, Ronald Gallatin. The idea was to issue long-term securities that could pay their buyers interest rates only a little above short-term rates. That was accomplished by having periodic auctions to reset the rate. As long as the auction succeeded, meaning there were willing bidders for the securities, any holder could sell the security at face value whenever there was an auction.

If an auction failed, the interest rate would rise to a penalty level that no company  or municipality  with decent credit would agree to pay for long. That issuer would then redeem the bonds.

So long as the auctions worked, the only risk to buyers was that an issuer's credit would go bad and the buyer would be stuck with the bonds.

The first auctions were for auction-rate preferred stock, but the idea soon spread to municipal bonds and then to preferred shares issued by closed-end municipal bond funds.

It is those last securities that seem least likely to resume trading anytime soon, largely because the penalty rates attached to them are so low that they will not attract new buyers. In a classic Catch-22, a low failure rate makes failures more likely.

In many cases, the penalty rates on those issues are less than 3.5 percent, a rate that is not attractive to buyers at the moment, given the risk that they might not be able to sell the security at a future auction. All 102 such auctions Tuesday failed.

"That should cause the leveraged municipal bond funds to redeem their preferreds," Gallatin, now retired, said Tuesday. He noted that at those penalty rates there was little benefit to common shareholders, and that preferred shareholders were suffering because the liquidity they expected was no longer

there.

The fund companies no doubt will resist such redemptions, in part because it would cost them some management fees. But fund directors have fiduciary responsibilities to all holders. which could force them to consider redeeming the preferred securities. If they do, a quarter or more of bonds held in such funds would have to be sold.

On Tuesday. 287 auctions succeeded  meaning that buyers were willing to buy securities that paid interest rates lower than the failure rate  and 519 failed. That was a slight improvement from Friday, when the figures were 247 and 525. Those figures include all auction-rate securities. whether taxable or not. Some rates are reset every week. some every month.

The chaos showed in two auction-rate securities issued by the East Bay Municipal Utility District in California. The only difference in the two securities was the original underwriter  one was underwritten by Merrill Lynch and the other by Citigroup.

The Merrill Lynch auction on Tuesday produced a tax-exempt rate of 7.98 percent; the Citigroup auction produced a rate of 5 percent. A week earlier, the Merrill auction produced a yield of 4.25 percent and the Citigroup one produced a rate of 7 percent.

"Some people ran to the other firm, and outsmarted themselves," Gallatin said.

Until a few weeks ago, those two securities almost always produced rates very close to each other, as one would expect in a reasonably efficient market.

It appears that many traditional buyers of auction-rate paper  risk-averse investors parking short-term money  have gone and have been replaced by a smaller number of opportunistic buyers attracted by high yields.

If an issuer is a good risk and the failure rate is attractive, a buyer of such paper will get a good yield until the security is redeemed or the auctions bring a lower yield. In either case, there is no risk other than the risk of tying up money for a longer period than planned. If, that is, the credit risk is a good one.

On Tuesday, 29 auctions failed for securities that had penalty rates (the rates the issuer must pay if the auctions keep failing) of 12 to 18 percent a year. All were insured against default by a bond insurance company.

Because those are tax-exempt rates, the taxable equivalent yields are extraordinary. But anyone who bought  perhaps by bidding at a rate just below the failure rate  ran the risk of owning the bond until a default, and then taking sizable losses if the insurance company did not pay.

One such security is a municipal bond issued by an agency in Lynchburg, Virginia, and backed by a local chain of hospitals known as Centra Health. The issue is guaranteed by MBiA. Until Tuesday, the auctions had always

Case 1:08-cv-02975-LTS    Document 1    Filed 03/21/2008    Page 37 of 41

succeeded; the rate a week ago was set at 4.25 percent. But the auction failed Tuesday, leading to a rate of 15 percent.

Notes:

IHT    Copyright © 2008 The International Herald Tribune |

# Financial Week

## SEC, billionaires fail to jump-start auction-rate bond market

This week's line score: 4.89% yield, 67% failure rate

March 14 2008

(Bloomberg)—The Securities and Exchange Commission, along with billionaires Bill Gross and Wilbur Ross, failed to restore confidence in the $330 billion auction-rate bond market, as borrowing costs for states and municipalities rose.

Auctions for borrowers from San Francisco to Houston were unsuccessful even after Mr. Gross, who runs the world's biggest bond fund, and Mr. Ross, who invests in distressed companies, said they were buying municipal debt to take advantage of rising yields. Thirty-year tax-exempt yields rose 6 basis points to 4.89% after falling 18 basis points last week from a three-year high of 5.01%, Municipal Market Advisors data show.

More than 67% of auctions failed this week, based on data compiled by Bloomberg. The market became unhinged last month, after dealers who supported the securities for more than two decades stopped bidding for bonds investors didn't want. Auction rates jumped to 6.73% this month from an average 3.94% in the previous year, the Securities Industry and Financial Markets Association said.

"Nobody is giving me any inkling that it's getting any better," said Arnold Goldner, a 56-year-old owner of a jewelry repair business in Fort Lauderdale, Florida. Mr. Goldner said he hasn't been able to sell $5 million in auction-rate preferred bonds sold by closed-end funds from Nuveen Investments and Blackrock, which borrow in the market alongside cities, hospitals, colleges and student lenders.

The SEC said it may let borrowers bid on their own auction- rate securities to help end the freeze and avoid breaking laws against market manipulation.

### Do it yourself

The agency is preparing "guidance" allowing them to join in auctions for the securities, whose yields are determined by bidding every seven, 28 or 35 days, as long as borrowers disclose "price and quantity" data about their bids, Erik Sirri, head of the SEC's trading and markets division, told the House Financial Services Committee March 12 in Washington.

Issuers from the Port Authority of New York and New Jersey to California's Department of Water Resources didn't wait for that help to start getting out of the auction market.

The Port Authority, the owner of bridges, tunnels, airports and transit facilities around New York City, sold $700 million of bonds March 12 to refinance auction securities after rates on the debt soared to 20% Feb. 12 from 4.3% the week before. California's water department sold $1 billion of revenue bonds backed by electric fees in another conversion.

Florida's Citizen's Property Insurance Corp., the state's largest property insurer, yesterday approved refinancing some of its $4.5 billion of auction securities with fixed-rate bonds and variable-rate demand notes.

"I don't believe there's anyone in the auction-rate market today who if they had a choice to get financing somewhere else wouldn't be trying to get it," said Charles Grande, who manages $13 billion of municipal securities for Hartford Investment Management.

Municipal bonds had their worst month in 21 years in February, losing 4.6%, Lehman Brothers Holdings Inc. said. Top-rated, 30-year tax-exempt bonds yielded a record 59 basis points more than taxable Treasuries, according to data compiled by Municipal Market Advisors. A basis point is 0.01 percentage point.

### Oh so picky

Mr. Ross, chairman of WL Ross & Co., and Mr. Gross, chief investment officer of Pacific Investment Management Co., said they jumped at the chance to buy $1 billion of municipals each. Their interest helped to drive last week's rally in fixed-rate debt.

Investors remain concerned that a flood of new issues from borrowers refinancing auction-rate debt will overwhelm demand while hedge funds and banks pare their purchases, analysts at New York-based Citigroup Inc. said in a March 7 report.

This week's failure rate is in line with the 66% average since Feb. 12, data from Wilmington Trust, Bank of New York Mellon, Wells Fargo and Deutsche Bank show. When auctions fail, the interest borrowers pay reverts to penalty rates of more than 10%, or lower ones pegged to a money-market benchmark.

"Investors are being incredibly selective," Mr. Grande said.

The few that are bidding favor bonds that promise higher rates, leaving those with lower rate caps, such as closed-end funds' preferred debt, to languish, he said. Of the successful auctions, 90% had rates higher than 5%, Deutsche Bank analysts said in a March 7 report.

The interest on $74 million of Cleveland airport auction debt doubled to $634,000 this month versus last month, according to data compiled by Bloomberg. The city next month plans to convert its $437 million of auction debt.

"Things were getting more dire," said Elizabeth Hruby, Cleveland's debt manager. "With variable-rate debt, you've got to be able to weather the storms, but this is fairly extreme."

URL for this article:
http://www.financialweek.com/apps/pbcs.dll/article?AID=/20080314/REG/606115608/1036

Reproductions and distribution of the above article are strictly prohibited. To order reprints and/or request permission to use the article in full or partial format please contact our Reprint Sales Manager at (732) 723-0569.

Home | Contact Us | Search | Editorial Calendar | Advertise | Issue Index

Crain Financial Group: Pensions & Investments | InvestmentNews | Workforce Management

Copyright ©2008 Crain Communications Inc
All rights reserved. Privacy Policy | Terms & Conditions



# Bloomberg.com

🖨

## Gross, SEC Fail to Break Auction-Rate Bond Paralysis (Update2)

By Jeremy R. Cooke



. **More Photos/Details**

March 14 (Bloomberg) -- Billionaires               and               and the U.S. Securities and Exchange Commission failed to restore confidence in the $330 billion auction-rate bond market, as borrowing costs for states and municipalities rose.

Auctions for borrowers from San Francisco to Houston were unsuccessful even after Gross, who runs the world's biggest bond fund, and Ross said they were buying municipal debt to take advantage of rising yields. Thirty-year tax-exempt         rose 5 basis points to 4.88 percent this week. Last week, they fell 18 basis points from a three-year high of 5.01 percent, Municipal Market Advisors data show.

More than 67 percent of auctions in the market that includes cities, colleges, hospitals, student lenders and closed-end funds failed this week, based on data compiled by Bloomberg. The market became unhinged last month, after dealers who supported the securities for more than two decades stopped bidding for bonds investors didn't want.

``Nobody is giving me any inkling that it's getting any better,'' said Arnold Goldner, a 56-year-old owner of a jewelry repair business in Fort Lauderdale, Florida. Goldner said he hasn't been able to sell $5 million in auction-rate preferred securities sold by funds from               and

The SEC said it may let borrowers bid on their own auction- rate securities to help end the freeze and avoid breaking laws against market manipulation.

SEC `Guidance'

The agency is preparing ``guidance'' allowing them to join in auctions for the securities, whose yields are determined by bidding every seven, 28 or 35 days, as long as borrowers disclose ``price and quantity'' data about their bids,            , head of the SEC's trading and markets division, told the House Financial Services Committee March 12 in Washington.

Issuers from the Port Authority of New York and New Jersey to California's Department of Water Resources didn't wait for that help to start getting out of the auction market.

The Port Authority, the owner of bridges, tunnels, airports and transit facilities around New York City, sold $700 million of bonds March 12 to refinance auction securities after rates on the debt soared to 20 percent Feb. 12 from 4.3 percent the week before. California's water department sold $1 billion of revenue bonds backed by electric fees in another conversion.

Florida's Citizen's Property Insurance Corp., the state's largest property insurer, yesterday approved refinancing some of its $4.5 billion of auction securities with fixed-rate bonds and variable-rate demand notes.

Refusing to Buy

``I don't believe there's anyone in the auction-rate market today who, if they had a choice to get financing somewhere else, wouldn't be trying to get it,'' said               , who manages $13 billion of municipal securities for Hartford Investment Management Co. in Hartford, Connecticut.

Auction      jumped to 6.73 percent this month from an average 3.94 percent in the previous year, the Securities Industry and Financial Markets Association said.

Investors and securities firms such as Zurich-based UBS AG and New York-based Goldman Sachs Group Inc. and JPMorgan Chase & Co. abandoned the market as losses tied to subprime mortgages and related securities threatened bond insurers' AAA ratings. The companies guarantee about half the $2.6 trillion of state and local government debt.

Municipal bonds had their worst month in 21 years in February, losing 4.6 percent, Lehman Brothers Holdings Inc. said. Top-rated, 30-year tax-exempt bonds yielded a record 59 basis points more than taxable Treasuries, according to data compiled by Municipal Market Advisors. A basis point is 0.01 percentage point.

Sparking Interest

Ross, chairman of WL Ross & Co., and Gross, chief investment officer of Pacific Investment Management Co., said they jumped at the chance to buy $1 billion of municipals each. Their interest helped to drive last week's rally in fixed-rate debt. Investors remain concerned that a flood of new issues from borrowers refinancing auction-rate debt will overwhelm demand while hedge funds and banks pare their purchases, analysts at New York-based Citigroup Inc. said in a March 7 report.

This week's overall auction market failure rate is in line with the 66 percent average since Feb. 12, data from Wilmington Trust Corp., Bank of New York Mellon Corp., Wells Fargo & Co. and Deutsche Bank AG show. When auctions fail, the interest borrowers pay reverts to penalty rates of more than 10 percent, or lower ones pegged to a                           .

``Investors are being incredibly selective,'' Grande said.

Interest Doubles

The few that are bidding favor bonds that promise higher rates, leaving those with lower rate caps, such as closed-end funds' preferred debt, to languish, he said. Of the successful auctions, 90 percent had rates higher than 5 percent, Deutsche Bank analysts said in a March 7 report.

The interest on $74 million of Cleveland airport auction debt doubled to $634,000 this month versus last month, according to data compiled by Bloomberg. The city next month plans to convert its $437 million of auction debt.

``Things were getting more dire,'' said Elizabeth Hruby, Cleveland's debt manager. ``With variable-rate debt, you've got to be able to weather the storms, but this is fairly extreme.''

To contact the reporter on this story:                    in New York at                           .

*Last Updated: March 14, 2008 16:53 EDT*

©2008 BLOOMBERG L.P. ALL RIGHTS RESERVED.